**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**PATRICK J. BROGAN,**

        **Plaintiff,**

 **vs.**                 5:14-cv-01016
                         (MAD)
**COMMISSIONER OF SOCIAL**
**SECURITY**,

        **Defendant.**
_____

**APPEARANCES:**            **OF COUNSEL:**

**PATRICK J. BROGAN**
Plaintiff, *pro se*
8434 Fathom Drive
Baldwinsville, New York 13027

**SOCIAL SECURITY ADMINISTRATION**  **SERGEI ADEN, AUSA**
Office of Regional General Counsel
Region II
26 Federal Plaza, Room 3904
New York, New York 10278-0004
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Patrick J. Brogan ("Plaintiff"), *pro se*, commenced this action on August 15, 2014, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of a decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB"). *See* Dkt. No. 1.

### II. BACKGROUND

Plaintiff's date of birth is November 4, 1964, which made him forty-one years old at the time he alleges onset of his disability on July 26, 2006. *See* Dkt. No. 13, Administrative Transcript ("T."), at 37, 287. Plaintiff resides with his spouse and children in a two-level townhouse with a basement. *See id.* at 303. Plaintiff does not have any trouble moving through the levels of his home, although he testified that he only uses the stairs a couple times of day. *See id.* at 81. At the time of his first hearing on April 9, 2010, Plaintiff's children were sixteen, five, and one years old. *See id.* at 38. Plaintiff's spouse works from the early morning until the afternoon so he has to get the children up and fed. *See id.* at 106. He then watches the kids play until his wife gets home from work. *See id.* at 52. At the time of the second hearing, Plaintiff's middle child was school age so he also puts him on the school bus in the morning. *See id.* At some point in the morning, Plaintiff performs a couple hours of computer work for his brother-in-law's company. *See id.* at 105. The remainder of his time is spent resting, relaxing, and watching television. *See id.* at 53, 107. Plaintiff is able to check his electronic mail on the computer, talk to friends on the phone, and attend church services once every three months. *See id.* at 56.

Plaintiff testified that he does not perform any household chores such as helping the kids with homework, vacuuming, picking up, dusting, or laundering. *See id.* at 54, 108-09. He testified that he occasionally loads the dishwasher. *See id.* at 109. Plaintiff's spouse does all the shopping, so he does not shop for food or clothing. *See id.* at 54, 101. Plaintiff is able to carry the groceries into the house. *See id.* at 57. If his spouse is not home, he was able to change his child's diapers. *See id.* at 54. For exercise, he occasionally tries to walk. *See id.* at 54. Plaintiff can do simple cooking, but he never prepares dinner. *See id.* at 53. After dinner, Plaintiff watches television and goes to bed at about ten o'clock in the evening. *See id.* Plaintiff does not take any medication to help him sleep. *See id.* at 101. He does not have any trouble sleeping and

2

sleeps through the night. *See id.* at 53, 101. Plaintiff is able to dress himself without assistance, and he is also able to take care of his own hygiene needs. *See id.* at 54. Plaintiff has a driver's license, and he drove himself to the first hearing without any problems. *See id.* at 38-39. At the second hearing, Plaintiff testified that he no longer drives. *See id.* at 86.

Due to a blood clotting disorder, Plaintiff gives himself Lovenox injections every twelve hours. *See id.* at 49, 97-98. According to Plaintiff, the injections are "excruciating" because the injection sites in his abdomen are painful with bruising and welting. *See id.* at 49, 98. This injection-site pain requires him to straiten up every hour if he is sitting, and it prevents him from turning his body or lifting anything. *See id.* at 44, 49-50, 98.

Plaintiff graduated from high school and completed one semester of college. *See id.* at 84. In 2010, he completed a six-week course in medical transcription training, but he has never worked in that field. *See id.* at 85. Plaintiff did not receive special education services when he was in school, and he does not have any deficits in reading or writing. *See id.* at 39, 84. Plaintiff has worked for Allen Maxwell Silver, Inc., his brother-in-law's company, on a part-time basis since February 2009 performing internet searches for telephone numbers.[1] *See id.* at 40-41. He works approximately thirteen to fifteen hours per week because his brother-in-law does not want him to work over eighteen hours. *See id.* at 81. Plaintiff testified that he does "Okay" with working but denies that he could work any more. *See id.* at 83-84. However, Plaintiff reported to his primary care physician that he was working forty hours per week for this company and, according to those records, he was "happy to be working." *See id.* at 540.

---

[1] The parties do not dispute that this work does not qualify as substantial gainful activity under 20 C.F.R. § 404.1572 based on Plaintiff's testimony that he was compensated about four-hundred dollars every other week.

3

Plaintiff worked for McLane Eastern, Inc. for twenty-one years in multiple positions. *See id.* at 43, 261-67, 336. Most recently, Plaintiff worked as a forklift operator in a distribution warehouse for seven to eight years. *See id.* at 292, 336. In addition to operating a forklift, Plaintiff was also required to load stock onto trucks, which involved routinely lifting twenty to fifty pounds, kneeling, and climbing. *See id.* at 292. Prior to that position, he operated the cigarette tax stamp machine on an assembly line for five to six years. *See id.* at 42-43. The first position he held was as a line selector, which involved pulling product to fill orders and loading them into a truck. *See id.* at 43. In each of those positions, heavy lifting was required.

On the questionnaire to the New York State Office of Temporary and Disability Assistance, Plaintiff indicated that he is able to pay bills, count change, and handle his saving and checking account. *See id.* at 305, 315. He also indicated that he does not have problems paying attention, and he is able to finish tasks to completion. *See id.* at 306. Plaintiff is able to follow spoken and written instructions, and he has not had any problems getting along with authority figures. *See id.* Although he testified that he is unable to do any light housekeeping, Plaintiff specifically stated that he does some light household chores in the questionnaire. *See id.* at 308, 312. Plaintiff described that his day involved interacting with his family, reading, and watching television. *See id.* at 312, 315. Plaintiff provides care for his youngest son, who at the time of the questionnaire was three years old. *See id.* In addition, Plaintiff stated that it is difficult for him to go out in public, and he misses family events. *See id.* He also claims that he is unable to play sports and playing with his children is limited. *See id.* at 305. Plaintiff describes his pain as stabbing, dull, and throbbing. *See id.* at 307. Plaintiff claims that he is able to walk a little every day and climb stairs slowly. *See id.* at 316. He claims that he cannot lift anything above five or ten pounds. *See id.* a 316.

On March 16, 2007, Plaintiff protectively filed an application for a period of disability and DIB alleging onset of disability on July 26, 2006. *See id.* at 244-46, 287. Plaintiff claimed in his application, that his ability to work is limited by recurrent cerebral venous thrombosis (blood clots in his brain). *See id.* at 291. Plaintiff claims that he had two blood clots in his brain and one blood clot in his left arm within a fifteen month period. *See id.* at 291. Plaintiff has not had any further blood clotting problems since starting Lovenox injections. *See id.* at 97. Plaintiff also claims that he has unexplained seizures. *See id.* at 291. The claim was disapproved on January 15, 2008, *see id.* at 116, and Plaintiff filed a request for a hearing, which was assigned to Administrative Law Judge Augustus C. Martin ("ALJ Martin"). *See id.* at 147-48, 155-81. A hearing was held on April 9, 2010, *see id.* at 30-72, and ALJ Martin found that Plaintiff was not disabled, *see id.* at 117-32. Plaintiff timely filed a request for review of that hearing decision, *see id.* at 205-07, and the Appeals Council remanded the case back to the administrative law judge, *see id.* at 133-38. The Appeals Council directed the ALJ to update the record with evidence of Plaintiff's mental impairment and to further evaluate Plaintiff's mental impairments, among other things. *See id.*

Plaintiff's case was then assigned to Administrative Law Judge Bruce S. Fein (the "ALJ"), *see id.* at 215-30, and a second hearing was held on June 20, 2012, *see id.* at 73-112. The ALJ determined that Plaintiff was not disabled as defined by the Social Security Act. *See id.* at 13-23. Plaintiff filed a timely request to the Appeals Council for review of the ALJ's decision, *see id.* at 6-9, and when that request was denied on June 9, 2014, the ALJ's decision became the Commissioner's final decision. *See id.* at 1-5.

In his decision, the ALJ found the following: (1) Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2011; (2) Plaintiff has not engaged in

5

substantial gainful activity during the period from his alleged onset date of July 26, 2006 through his date last insured of December 31, 2011; (3) Plaintiff's medical conditions of superior sagittal sinus thrombosis, depressive disorder, and anxiety disorder were severe impairments; (4) Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1; (5) Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) with some limitations, and he is limited to low stress jobs with limitations, but he retains the ability to perform simple, routine, repetitive tasks, and occasional complex tasks; (6) Plaintiff's RFC renders him not capable of performing past relevant work; and (7) considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. *See id.* at 13-23. Accordingly, the ALJ found that Plaintiff is not disabled, as defined in the Social Security Act. *See id.*

Plaintiff commenced this action for judicial review of the denial of his claims by the filing of a complaint on August 15, 2014. *See* Dkt. No. 1. The parties have moved for judgment on the pleadings. *See* Dkt. Nos. 16, 21. Having review the administrative transcript, the Court orders that the Commissioner's decision is affirmed.

### III. DISCUSSION

**A. Standard of Review**

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). The Court must examine the administrative transcript to determine whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009);

*Schaal v. Apfel*, 134 F.3d 496, 500-01 (2d Cir. 1998). "A court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if it appears to be supported by substantial evidence." *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations and quotation marks omitted).

If supported by substantial evidence, the Commissioner's factual determinations are conclusive, and the court is not permitted to substitute its analysis of the evidence. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) ("[The court] would be derelict in its duties if we simply paid lip service to this rule, while shaping [the court's] holding to conform to our own interpretation of the evidence"). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B.  Analysis**

*1. Disability analysis*

For purposes of both DIB and SSI, a person is disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). There is a sequential, five-step analysis for evaluating these disability claims:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental
> ability to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider him disabled without
> considering vocational factors such as age, education, and work
> experience. . . . Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional capacity to
> perform his past work. Finally, if the claimant is unable to perform
> his past work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)). After the third step, the ALJ assesses relevant medical evidence and other evidence and then determines the plaintiff's RFC, which is used in steps four and five. *See* 20 C.F.R. § 404.1520 (a)(4), (e). The plaintiff bears the burden on steps one through four, and then the Commissioner has the burden on the final step "of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa*, 168 F.3d at 77 (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986) (internal quotation marks omitted).

### *2. RFC*

At the fourth step in the analysis, the ALJ determines a plaintiff's RFC, which is what a plaintiff can still do despite his or her limitations. *See* SSR 96-8P, 1996 WL 374184, *2 (July 2, 1996). The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairments(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id.* The assessment takes into consideration the limiting effects of all of a

8

plaintiff's impairments, severe and non-severe, and the determination sets forth the most a plaintiff can do. *See* 20 C.F.R. § 404.1545(a)(1), (e).

Plaintiff argues that the "ALJ allowed testimony of a defense medical expert to render an opinion outside of his field of qualification, and without proper foundation to accept such witness as an expert in a different area of specialized medicine."[2] *See* Dkt. No. 21 at 6. Although Plaintiff does not specify which medical expert he is referring to, he cites to the medical records from his treating hematologist, Dr. Bernard Poiesz, M.D. *See id.* The ALJ gave great weight to the opinion of Dr. Poiesz, who opined that Plaintiff can sit, stand, and walk for unlimited amounts of time but cannot engage in any activity that would subject him to trauma. *See* T. at 20, 423-27. In his records, Dr. Poiesz stated that Plaintiff permanently suffers from a hypercoagulable state and is treated with Lovenox, but Dr. Poiesz stated that Plaintiff does not have any other conditions significant to recovery. *See id.* at 423-27.

Plaintiff began treatment with Dr. Poiesz's medical group for sagittal sinus thrombosis in September 2005, but began treatment with Dr. Poiesz on July 26, 2006. *See id*. at 434-35, 442-43. Dr. Poiesz continued to treat Plaintiff and prescribe Lovenox until November 2009. *See id.* at 434-501. At each visit, Dr. Poiesz performed a physical examination of Plaintiff and found that Plaintiff's abdomen was soft and non-tender. *See id.* He observed "scattered ecchymoses from the Lovenox injections" and granulomas, but Dr. Poiesz specifically recorded that the sites are non-tender. *See id.* at 429,434. Dr. Poiesz advised Plaintiff that he should avoid activities that could cause injury to his spleen or big internal injuries, such as cliff diving and football, but that he could play non-contact basketball. *See id.* at 435. In October 2008, Plaintiff requested Dr.

---

[2] Each of Plaintiff's contentions are raised in short, one-paragraph arguments. *See* Dkt. No. 21 at 5-20.

9

Poiesz to write a letter stating that Plaintiff was not able to work. *See id.* at 499. Plaintiff was advised that he has limitations in his ability to work in positions where there is a high risk of injury but that Dr. Poiesz does not find him to be totally disabled. *See id.*

The ALJ must evaluate every medical opinion in the record. *See* 20 C.F.R. § 404.1527(c). If the opinion comes from a treating physician, then the ALJ generally will give more weight to that opinion "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairments." 20 C.F.R. § 404.1527(c)(2). Among the factors that are listed in the Social Security Regulations, the ALJ can consider whether the opinion is from a specialist in his or her area of specialty when assigning a weight to be accorded to that opinion. *See* 20 C.F.R. § 404.1527(c)(5). To address Plaintiff's contention, the Social Security Regulations already take into account that some medical providers may have areas of specialization and direct administrative law judges to consider that as a factor when assigning weight to expert opinions. There is nothing in the regulations to suggest that an opinion should be rejected outright because the opinion is not within a particular specialization. *See id.*

Plaintiff also argues that the ALJ overlooked the inconsistencies in Dr. Poiesz's statements about Plaintiff's future treatment. *See* Dkt. No. 21 at 15. Specifically, Plaintiff directs the Court to compare Dr. Poiesz's statement in the treatment records that Plaintiff will be treated with Lovenox for life with a statement attributed to Dr. Poiesz in the records of Dr. Kaushal B. Nanavati, M.D., where he told Dr. Nanavati that Plaintiff's treatment with Lovenox "may be a lifetime therapy." *See id.* The Court finds this contention to be without merit. First, Dr. Nanavati's notes about a conversation he had with Dr. Poiesz do not equate with a statement from Dr. Poiesz. Second, the two alleged statements are not materially inconsistent; both statements indicate future, long-term use of Lovenox. In any event, the length of time Plaintiff will be

10

prescribed Lovenox is not specifically found by the ALJ, but the RFC accounts for the treatment of Lovenox by precluding exposures to hazards and providing the Plaintiff is not able to climb ladders, rope, or scaffold. *See* T. at 18.

Plaintiff believes that ALJ erred by not permitting him to remove his shirt at the hearing to show the bruising on his abdomen caused by the Lovenox injections. *See* Dkt. No. 21 at 13. Congress granted the power and authority to the Social Security Commissioner to establish rules, regulations, and procedures to carry out the disability hearings. *See* 42 U.S.C. § 405(a-b). "[T]he conduct of the hearing rests generally in the [ALJ's] discretion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971). The Social Security Administration's regulations place the presentation and reception of evidence in the ALJ's control. *See* 20 C.F.R. § 404.950(c). In the context of the use of a physician's report in a social security disability hearing, the Supreme Court found that due process requires that a social security disability hearing must be full and fair. *See Richardson*, 402 U.S. at 401-02. In the context of subpoenaing physicians to testify at disability hearings, the Second Circuit held that due process is "satisfied by providing a claimant with the opportunity to cross-examine a reporting physician where reasonably necessary to a full development of the evidence in the case." *Yancey v. Apfel*, 145 F.3d 106, 113 (2d Cir. 1998) (internal quotation marks and citations omitted). Applying that rule for a fair and meaningful opportunity to present his or her case, the Court finds that Plaintiff was provided with that opportunity. The ALJ did not abuse his discretion when Plaintiff was not permitted to demonstrate his bruises. There is medical evidence that was credited by the ALJ, which included observations of Plaintiff's bruising and granulomas – specifically, Dr. Poiesz observed and recorded the bruising from the Lovenox injections on multiple occasions. *See* T. at 429, 434.

Plaintiff contends that the ALJ also erred in his evaluation of a non-examining medical expert. *See* Dkt. No. 21 at 8. According to Plaintiff, the opinions of Dr. Chukwuemeka Efobi, Ph.D., are inconsistent with the record as a whole and, therefore, are not supported by the evidence in the record. *See id.* The weight that is accorded to a non-examining source depends on the degree of the explanation that is offered for the opinion and the pertinent evidence of treating and other examining sources. *See* 20 C.F.R. § 404.1527(c)(3). At the request of the ALJ, Dr. Efobi completed a medical source statement of ability to do work-related activities (mental) based upon the evidence in the record. *See* T. at 624-34. Dr. Efobi found that Plaintiff has periods of anxiety and depression, but Plaintiff is able to still perform child care duties and work from home. *See id.* at 624-34. Notably cited by Dr. Efobi, Plaintiff reported to his primary care physician that Plaintiff is "happy" working forty hours per week for his brother-in-law's company. *See id.* at 540, 627. In addition, Dr. Efobi cites to Plaintiff's mental status examinations from treating providers that show normal attention and concentration. *See id.* Dr. Efobi cited specifically to treatment records from Dr. Nanavati, Dr. Jack Houk, Ph.D., and Dr. Dennis Noia, Ph.D., that support his opinions. *See id.* at 627-634. The Court finds that the ALJ did not erroneously assign great weight to Dr. Efobi's opinions, as a non-examining expert, because Dr. Efobi's explanation for his opinions is supported by the cited medical evidence in the record.

### *a. Treating Physician Rule*

Plaintiff contends that the RFC, as determined by the ALJ, is not supported by substantial evidence because the ALJ did not assign controlling weight to Plaintiff's treating psychologist, Dr. Jack Houk, Ph.D., a licensed psychologist.[3] *See* Dkt. No. 21 at 7, 30-31. Plaintiff claims that

---

[3] Plaintiff adopts the argument presented by his previous attorney to the Appeals Council. *See* Dkt. No. 21 at 30-31.

12

Dr. Houk's medical source statements should have been accorded controlling weight because the opinion is supported by medically acceptable techniques and the opinion is consistent with Dr. Houk's treatment records of Plaintiff. *See id.* at 30-31. Dr. Houk's medical opinions about the severity of Plaintiff's impairments and symptoms can be entitled to "controlling weight" when the opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also* 20 C.F.R. § 404.1527(a)(2); *Martin v. Astrue*, 337 Fed. Appx. 87, 89 (2d Cir. 2009) ("Although the final responsibility for deciding issues relating to disability is reserved to the Commissioner, an ALJ must give controlling weight to a treating physician's opinion on the nature and severity of the [plaintiff's] impairment when the opinion is well-supported by medical findings and not inconsistent with other substantial evidence.") (citations omitted); *Williams v. Comm'r of Soc. Sec.*, 236 Fed. Appx. 641, 643-44 (2d Cir. 2007) (noting that inconsistent evidence can be in the form of opinions of other medical experts).

If an ALJ refuses to assign a plaintiff's treating physician's opinion controlling weight, he or she must state a good reason for that determination. *See Saxon v. Astrue*, 781 F. Supp. 2d 92, 102 (N.D.N.Y. 2011). The "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citation omitted). The regulations list factors the ALJ should consider when evaluating the appropriate weight to assign to medical opinions, including a treating source's opinion that is not assigned controlling weight. *See* 20 C.F.R. § 404.1527(c). The factors include (1) the frequency of the examination and the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist; and (5) other factors brought to the

13

Social Security Administration's attention that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). A treating physician's opinion can be contradicted by other substantial evidence, such as opinions of other medical experts. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). The less consistent an opinion is with the record as a whole, the less weight it is to be given. *Otts v. Comm'r of Soc. Sec.*, 249 Fed. Appx. 887, 889 (2d Cir. 2007).

Dr. Houk completed two medical source statements on May 3, 2010 and June 21, 2012. *See* T. at 552-54, 571-73. Dr. Houk's medical source statement in May 2010 was based upon one evaluation, and the diagnosis was unremitting depression. *See id.* at 552. Dr. Houk opined that Plaintiff has no useful ability to function in maintaining attention for two hour segments, and Plaintiff was unable to meet competitive standards in understanding and remembering very short and simple instructions, sustaining an ordinary routine without special supervision. *See id.* at 553. Dr. Houk also found that Plaintiff was seriously limited but not precluded from carrying out very short and simple instructions and making simple work-related decisions, among other findings.

However, Plaintiff's statements are inconsistent with these limitations. Plaintiff stated that he does not have any problems paying attention, completing tasks, or following written or spoken instructions. Plaintiff is able to read for enjoyment, and he can concentrate to pay bills and manage his finances. *See id.* at 305, 317. Further, Plaintiff is able to maintain part-time employment. He completes a "couple of hours of [] computer work" each day and up to eighteen hours per week. *See id.* at 105. Plaintiff was also able to maintain attention to complete a six-week course in medical transcription. *See id.* at 84-85. The medical source statement is also

inconsistent with Dr. Houk's treatment record, where Dr. Houk found that Plaintiff had normal decision-making function and judgment. *See id.* at 578.

Dr. Houk's medical source statement from June 2012 diagnosed Plaintiff with "unremitting pain [that] limits productive activity permanently." *See id.* at 571. Dr. Houk identified Plaintiff's symptoms to include an appetite disturbance with weight change, sleep disturbances, and memory impairment. *See id.* Dr. Houk explained that the limitations on Plaintiff's mental abilities are caused by his pain, nausea, and sleep disorder. *See id.* at 572. However, Plaintiff testified the day before that he does not have any trouble sleeping, and he does not require any sleep-aid medication. *See id.* at 101. Plaintiff also testified that he lost about ten pounds as a result of eating better. *See id.* at 79-80. Dr. Houk's treatment records document that he found Plaintiff's recall and memory to be normal. *See id.* at 578.

The ALJ gave the opinions of Dr. Houk little weight because he found inconsistency between the claimed limitations and Plaintiff's statements and other medical records. *See id.* at 19-20. The ALJ cites to Plaintiff's daily activities, including the ability to work part-time and care for his children. *See id.* at 21. The ALJ noted that Plaintiff received treatment from Dr. Houk on a sporadic basis, but the whole decision makes clear that the ALJ assessed Dr. Houk's medical records, which included four visits at the end of 2010, one visit in 2011, and two visits in 2012. *See id.* at 13-21, 555-600. In the decision, the ALJ evaluated and summarized the medical opinions from Dr. Dennis M. Noia, Ph.D., and Dr. Chukwuemeka Efobi. *See id.* at 20-21. Dr. Efobi found that Plaintiff's attention and concentration are intact, and he opined that Plaintiff had only mild limitations to understanding and remembering simple instruction, carrying out simple instructions, and making judgements on simple and complex work-related decisions.. *See id.* at

20-21, 627-34. Based upon the record, the Court finds that the ALJ's determination to assign little weight to Dr. Houk's opinion is supported by substantial evidence.

### *b. Credibility*

Plaintiff contends that ALJ Martin "insinuated Plaintiff was not being truthful in his testimony" at the first hearing because he did not take into consideration that Plaintiff medical conditions had worsened over time. *See* Dkt. No. 21 at 12. An ALJ assesses a plaintiff's subjective symptoms using a two-step process. *See* 20 C.F.R. §§ 404.1529(c)(1), 404.1545(a)(3), (e); SSR 96-7P, 1996 WL 374186, at *1. At the first step, the ALJ must determine whether a plaintiff has an underlying impairment that is established by acceptable clinical diagnostic techniques and could reasonably cause a plaintiff's symptoms. *See* SSR 96-7P, 1996 WL 374186, at *2. If an impairment is shown, the ALJ "must evaluate the intensity, persistence, and limiting effects of the [plaintiff's] symptoms to determine the extent to which the symptoms limit the [plaintiff's] ability to do basic work activities." *See id.* at *2. "When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole." *Wells v. Colvin*, 87 F. Supp. 3d 421, 431 (W.D.N.Y. 2015); *see also Snell*, 177 F.3d at 135.

The ALJ, who wrote the decision currently on appeal, had updated medical evidence in the record when he evaluated Plaintiff's credibility. Therefore, even assuming that the medical evidence was not up to date with Plaintiff's medical condition at the time of the first hearing, there is no indication that the ALJ did not properly evaluate Plaintiff's credibility upon the evidence in the record when he issued his decision. Further, Plaintiff does not identify any condition that worsened or progressed such that the medical evidence evaluated in the ALJ's decision was not a fair representation. The ALJ set forth the two-step process that he used to evaluate Plaintiff's

16

symptoms. *See* T. at 19. The medical conditions of sagittal sinus thrombosis, anxiety, and depression were found to be medically determinable impairments. *See id.* However, the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. *See id.* In making that determination, the ALJ evaluated Plaintiff's testimony about his daily activities, including Plaintiff's ability to work part time for his brother-in-law, spend time with his family, perform housework, read, watch television, take walks, care for his children, and maintain his personal care. *See id.* The ALJ also reviewed medical evidence that was inconsistent with the severity of symptoms claimed by Plaintiff, such as the consultive examination by Dr. Noia, treatment records from Dr. Jack Houk, Ph.D., treatment records from Dr. Poiesz, and Dr. Efobi's medical source statement. Accordingly, the Court finds no error in the ALJ's credibility analysis.

### 3. Vocational Expert

Plaintiff argues that the ALJ did not permit the vocational expert to answer Plaintiff's counsel's question at the hearing on April 9, 2010. *See* Dkt. No. 21 at 18. The transcript is as follows:

> Q: Okay. And then, my only question is, if the judge were to find
> Mr. Brogan fully credible with his testimony, would there be any
> jobs that he could do in your opinion?
> A: No, I - -
> ALJ: Counsel, I'm not sure that he would relay that in some kind of
> functional assessment, or something with specific limitations,
> because there are multiple interpretations to what fully credible is
> as far has his testimony.
> ATTY: Okay. Well, okay. Well then, no, I don't have any
> questions for him then.

T. at 70-71. The Court finds that the ALJ did not prevent Plaintiff's counsel from asking a question but advised counsel that the form of the question was open to interpretation and relative

17

to what "fully credible" means. There is no indication in the hearing transcript that Plaintiff's counsel was precluded from correcting the form of the question.

### *4. Bias*

Plaintiff argues that the ALJ demonstrated bias and prejudice against him when the ALJ made disparaging remarks about Plaintiff, his counsel, and his case at the hearing. *See* Dkt. No. 21 at 5. The record indicates that outside the presence of Plaintiff the ALJ made several statements unknowingly on the record about the procedure of Plaintiff's case.[4] *See* T. at 110-11. "Undeniably, a claimant seeking administrative review of an application fom Social Security benefits is entitled to a hearing before an unbiased ALJ." *Bodine v. Colvin*, Civ. Action No. 3:11-CV-1265, 2013 WL 1108625, *7 (N.D.N.Y. Feb. 25, 2013) (citing *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *see also Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999). The administrative law judges in social security claims are presumed to be unbiased. *See Bodine*, 2013 WL 1108625, at *7 (citing *Rollins v. Massanari*, 261 F.3d 853, 857-58 (9th Cir. 2001). A plaintiff can overcome this presumption with "evidence of bias or an inability of an ALJ [to] be fair." *Bodine*, 2013 WL 1108625, at *7. However, an ALJ's expressions of impatience, dissatisfaction, annoyance, and anger do not establish bias but, instead, merely represent that administrative law judges are "imperfect men and women." *Rollins*, 261 F.3d at 857-58 (finding that the administrative law judge's expressions of sarcasm and impatience did not rebut the presumption of unbias).

---

[4] The ALJ stated "Yes, I know exactly what happened in this case," describing that Plaintiff's counsel took over the case and immediately sent him for treatment with a psychologist. T. at 110. The ALJ stated that Plaintiff was able to have the case remanded from the Appeals Council because the psychological records were submitted after the first hearing. *See id.* at 111. He concluded by stating, "[I]t's all playing a game with [Plaintiff's counsel]." *Id.*

The Court finds that, although the ALJ's statements were misadvised, these statements clearly expressed his impatience with the evidentiary procedure undertaken by Plaintiff's counsel, but there is no evidence to overcome the presumption that the ALJ was unbiased. Further, as discussed, the Court finds that there is substantial evidence in the record to support the ALJ's determination that Plaintiff is not disabled. There was no indication in the ALJ's decision that his findings were made based upon any prejudice or bias against Plaintiff or his counsel. Accordingly, the Court does not find any basis for Plaintiff's claims that the ALJ exhibited any bias against her.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and, for the above-stated reasons, the Court hereby

**ORDERS** that the Commissioner's decision denying disability benefits is **AFFIRMED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 1, 2016
      Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge